In re BUCYRUS GRAIN CO.,
INC., Debtor.

STATE BANK OF SPRING
HILL, Claimant,

v.

BUCYRUS GRAIN CO., INC., Debtor.

Bankruptcy No. 84–20269.

United States Bankruptcy Court,
D. Kansas.

Nov. 20, 1986.

See also Bkrtcy., 56 B.R. 204.

C. Maxwell Logan, Overland Park, Kan.,
for debtor.

Thomas L. Griswold, Olathe, Kan., for
Claimant Bank.

Leon B. Seck of Swafford & Seck, Kansas City, Mo., for Effertz Bros.

Frederick B. Farmer of Lowe, Terry &
Roberts, Olathe, Kan., for Anderson Bros.

Charles D. Sauer, Overland Park, Kan.,
for "multiple creditors".

James S. Willis, Kansas City, Kan., trustee.

## MEMORANDUM OPINION

BENJAMIN E. FRANKLIN, Chief
Judge.

This matter came on for hearing on February 27 & 28, 1986, on State Bank of

Spring Hill's motion for relief from the automatic stay in order to set off the Bucyrus Grain Company's checking account. State Bank of Spring Hill appeared by and through its attorney Thomas L. Griswold. Several creditors objected and claimed the account, including: Effertz Brothers, Anderson Brothers, Don Meinhold, Vohs & Moore, Joseph Zacher, B.W.S. Investments, Evelyn Rigney, Dale Nevius, and Francis Rickman. Effertz Brothers appeared by and through its attorney Leon B. Seck. Anderson Brothers appeared by and through its attorney, Frederick B. Farmer. Meinhold, Vohs & Moore, Zacher, B.W.S. Investments, Nevius, Rigney, and Rickman appeared by and through their attorney, Charles D. Sauer. The trustee also objected to the bank's claim. The trustee, James S. Willis, appeared in person.

This Court took the matter under advisement. The Court ordered the parties to submit proposed findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Bucyrus Grain Company, Inc. (hereinafter "Bucyrus Grain"), is a Kansas corporation doing business as a grain elevator. Neither Bucyrus Grain nor its president, James Creamer, was registered with the Commodities Futures Trading Commission as a futures commission merchant. Carl Anderson and Emett Anderson, d/b/a Anderson Brothers, are farmers from Missouri and Kansas respectively. Don Meinhold, Joseph Zacher, Evelyn Rigney, B.W.S. Investments, Dale Nevius, Vohs & Moore, and Francis Rickman (hereinafter "multiple defendants") are Kansas customers of Bucyrus Grain Company. State Bank of Spring Hill (hereinafter "State Bank") is a Kansas bank.

2. On or about October 26, 1983, in order to take advantage of the special margin rates available to Bucyrus Grain in the futures market, the Anderson Brothers solicited the elevator to purchase five July, 1984 soybean futures contracts. On October 26, 1983, Anderson Brothers delivered $25,000 to James Creamer, president of Bucyrus Grain Company, in order to acquire five July, 1984 soybean future contracts. Creamer purchased the July bean contracts in the name of Bucyrus through the brokerage firm of Drexler, Burnham and Lambert, Inc. At the time the debtor acquired the July bean contracts, the debtor also had its own commodity futures contracts with either Drexler, Burnham and Lambert, Inc., or another brokerage firm, Cargill Investors Services. However, Bucyrus did not purchase commodities futures in July, 1984 beans.

3. In late January, 1984, the debtor closed out the Anderson Brothers' position and all of its own contracts in July beans.

4. On March 29, 1984, State Bank received a wire transfer of $27,000 from Cargill Investor's Service into the Bucyrus checking account. The transfer represented partial proceeds from the liquidation of Bucyrus positions in the Cargill account.

5. On March 30, 1984, Creamer deposited into the checking account a number of checks including a $30,026 check from Cargill Investor's Service. The check represented the remaining proceeds from the liquidation of Bucyrus positions in the Cargill account. Cargill Services stopped payment on the $30,026 check, and instead, wire transferred the amount to the checking account on April 4, 1984.

6. Bucyrus Grain Company, Inc. filed a Chapter 7 bankruptcy petition on March 30, 1984.

7. Prior to the filing of the bankruptcy petition on March 30, 1984, the multiple defendants stored grain at the Bucyrus elevator. The multiple defendants sold grain to Bucyrus Grain. Bucyrus Grain issued checks to the multiple defendants in the following amounts:

  A. B.W.S. Investments—$1,172.13
  B. Dale Nevius—$607.06
  C. Mrs. Evelyn Rigney—$607.06
  D. Don Meinhold—$2,731.19
  E. Dr. Joseph Zacher—$342.96
  F. Vohs & Moore—$7,295.76
  G. Francis Rickman—$428.85

8. After the bankruptcy, the multiple defendants presented the checks to State Bank. State Bank refused payment and returned the checks.

9. The Bucyrus checking account had an overdraft balance on March 29, 1984. However, on the date of bankruptcy, March 30, 1984, the account had a positive balance of $46,421.20. As such, the positive balance was the result of deposits made on that date. On the last two days before bankruptcy, Bucyrus Grain deposited funds paid on account for the sale of inventory and the money from the Cargill Investor's Service account.

10. At the time of filing the petition, Bucyrus Grain owed State Bank $780,068.65. The indebtedness arose as follows:

A. Note dated March 31, 1980 ($400,000)

B. Note dated February 4, 1984 ($100,000)

C. Note dated March 14, 1984 ($90,000)

D. Note dated March 15, 1984 ($100,000)

E. Note dated December 2, 1983 ($30,422.42)

F. Note dated November 23, 1983 ($70,000)

G. Note dated March 19, 1984 ($20,000)

H. Note dated February 27, 1984 ($16,510)

I. Note dated March 12, 1984 ($39,512.23)

11. The bank acquired the following security for the Bucyrus Grain debts:

A. Certificates of deposit Nos. 10422 and 1043 held by the bank pursuant to a collateral deposit agreement dated July 22, 1982.

B. Miscellaneous weed control chemicals and seed soybeans by security agreement dated April 26, 1979.

C. All accounts receivable and all inventory now owned or hereafter acquired by security agreement dated April 26, 1979.

D. All machinery and equipment, furniture and fixtures, inventory and all present or future accounts receivable, proceeds arising therefrom, chattel paper, contract rights and general intangibles, however evidenced or acquired, and all additions and accessions thereto by security agreement dated March 18, 1980.

12. The bank properly perfected the security interests in the Bucyrus Grain property prior to bankruptcy.

13. In cooperation with the trustee, the bank has reclaimed part of the collateral and applied the proceeds from the sale to the outstanding debt. As such, the outstanding indebtedness owed the bank by Bucyrus Grain as of March 22, 1985, was $458,198.65.

## ISSUE OF LAW

WHETHER OR NOT THE STATE BANK OF SPRING HILL CAN SET OFF THE $46,421.20 OF PROCEEDS FROM THE BUCYRUS GRAIN CHECKING ACCOUNT AGAINST BUCYRUS GRAIN'S OUTSTANDING DEBT.

## CONCLUSIONS OF LAW

State Bank's claim to the $46,421.20 of proceeds from the checking account is based on two independent theories. First, State Bank claims a statutory and common law right of setoff of the account against the pre-petition debts of Bucyrus Grain. In the alternative, State Bank claims the account as proceeds from the sale of its collateral. State Bank requests this Court to either grant it relief from the automatic stay to allow setoff or to order the trustee to abandon the account.

The Anderson Brothers also claim the proceeds of the account. The claim is based upon Subchapter IV of Chapter 7 of Title 11 (Commodities Liquidation Subchapter). Under this law, the Anderson Brothers argue that Bucyrus Grain became a "futures commission merchant" and they became "customers" when Bucyrus Grain accepted the $25,000 on October 26, 1983, and acquired the five contracts for the July 1984 soybeans. As such, the $25,000 is

"customer property" under the Code. The Anderson Brothers claim they are entitled to payment in full from the checking account.

The multiple defendants also claim interests in the checking account. The claims are identical, except in amount, and are based on a conversion cause of action arising under the case of *Iola State Bank v. Bolan*, 235 Kan. 175, 679 P.2d 720 (1984).

This Court finds that the State Bank's claim is superior to all the other claims. State Bank has a right of setoff and a perfected security interest in the funds. The Anderson Brothers failed to state a claim under the commodities subchapter of the Code. The multiple defendants failed to state a claim under the *Iola State Bank*.

**A.  State Bank's Right of Setoff and Security Interest.**

A bank's right to set off mutual debts against the debtor before the commencement of the bankruptcy case is specifically preserved in 11 U.S.C. § 553(a) which states:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed other than under section 502(b)(3) of this title;

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case;  or

(B)(i) after 90 days before the date of the filing of the petition;  and

(ii) while the debtor was insolvent; or

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition:

(B) while the debtor was insolvent: and

(C) for the purpose of obtaining a right of setoff against the debtor.

A setoff after the commencement of the case is subject to the restraints of 11 U.S.C. § 362(a)(7). The bank must obtain relief from the automatic stay. *In re Nelson*, 6 B.R. 248, 249 (Bankr.D.Kan.1980). State Bank applied for relief from the stay.

■ The major requirement of section 553(a) is that the debts must be mutual. 11 U.S.C. § 553(a). The debts between Bucyrus Grain and State Bank are mutual. The checking account created a debtor-creditor relationship between the parties in the amount of $46,461.20. *New York County National Bank v. Massey*, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380 (1904). Bucyrus Grain owes the bank at least $458,198.65. As such, State Bank can set off the $46,461.20 against the larger debt of $458,198.65.

■ In addition, State Bank has a valid perfected security interest in the account as proceeds from the transfer of secured collateral. The March 18, 1980, security agreement gave State Bank a security interest in all of the debtor's machinery and equipment, furniture and fixtures, inventory, present and future accounts receivables, chattel paper, and proceeds arising therefrom. State Bank properly perfected the security interest by filing on March 7, 1980. Kan.Stat.Ann. § 84-9-302 (1983).

Under the agreement and the Uniform Commercial Code, the security interest can extend to proceeds from the sale of the collateral. *See* Kan.Stat.Ann. § 84-9-306 (1983); and *Tuloka Affiliates, Inc. v. Security State Bank*, 229 Kan. 544, 627 P.2d 816 (1981). On the last two days before bankruptcy, Bucyrus Grain deposited either moneys paid on account for the sale of inventory or the money from the Cargill Investor's Service Account. State Bank had a security interest in the inventory. As such, State Bank's security interest is traceable to the proceeds from the sale of

the inventory. The question that remains, however, is whether the bank has a security interest in the proceeds from the Cargill account.

The right of Bucyrus Grain to receive funds upon the closing of the Cargill account is difficult to classify. This Court, however, finds that the right falls within the catch-all category of "general intangibles." "General intangibles" is defined as "any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money." Kan.Stat.Ann. § 84–9–106 (1983). Courts have interpreted the definition broadly enough to include: an expedited recovery from a condemnation action, *Board of County Commissioners v. Berkeley Village*, 40 Colo.App. 431, 580 P.2d 1251 (1978); a tax refund, computer software, patent rights, trademarks, goodwill, a vendor's interest in an installment land contract, *Madison National Bank v. Newrath*, 261 Md. 321, 275 A.2d 495 (1971); and a liquor license, *In re Matto's, Inc.*, 30 U.C.C.Rep. 1684 (Bankr.E.D.Mich.1981).

The definition is certainly broad enough to cover this right to payment from a commodities futures trading account. Therefore, by filing the financing statement, the bank perfected the security interest in the proceeds. *See First National Bank of Gaylord v. Autrey*, 9 Kan.App.2d 96, 98, 673 P.2d 448 (1983).

As such, State Bank has a valid claim to the proceeds under either a setoff theory or a perfected security interest theory. The issue now becomes whether the Anderson Brothers or the multiple defendants have an interest superior to the bank's claim.

*B. Anderson Brothers Claim Under the Commodities Liquidation Subchapter of the Code.*

Subchapter IV of Chapter 7 of Title 11 (Commodities Liquidation Subchapter) is a law that specifically addresses the bankruptcy of commodity brokerage firms. *See* 11 U.S.C. §§ 761–766. The Subchapter increases protection of the broker's customers by (1) granting customers priority over all claims except those attributable to the administration of customer property, (2) by granting all commodity customers across-the-board pro rata distribution, and (3) granting customers limited control over postpetition disposition of open commodities contracts. 4 Collier on Bankruptcy ¶ 760.01 (15th ed. 1986).

Qualification for this increased protection is limited to customers of a "commodity broker." 4 Collier on Bankruptcy ¶ 760.01 (15th ed. 1986). Section 101(5) of the Code defines a commodity broker to include a "futures commissions merchant." 11 U.S.C. § 101(5).

■ The Anderson Brothers argue that Bucyrus Grain became a "futures commission merchant" when Creamer accepted the $25,000 on October 26, 1983, and acquired through Drexel, Burnham and Lambert, Inc., the five contracts for July 1984 soybeans. State Bank argues that the commodities liquidation statute is limited to entities which deal in the brokerage business. The statute does not cover a transaction in which a farmer solicits a grain elevator to purchase futures contracts on their behalf, commission free. This Court agrees.

A close reading of the statute supports this conclusion. The phrase "futures *commission* merchant" itself suggests that the broker is in the business of soliciting customers to invest on a commission basis. Bucyrus Grain did not deal in the futures market on behalf of the Anderson Brothers for a commission. The Anderson Brothers could have dealt with a licensed commodities broker. Instead, in order to take advantage of the special margin rates available to Bucyrus Grain, the Anderson Brothers asked the elevator to purchase the July 1984 beans on their behalf.

This restrictive reading of the statute is supported by public policy. Neither Bucyrus Grain nor James Creamer was registered with the Commodities Futures Trading Commission as futures commission merchants. As such, the transaction between Bucyrus Grain and the Anderson

Brothers was unlawful. *See* 7 U.S.C. § 6d. If the Anderson Brothers wanted the special protection provided for customers of futures commission merchants, they should have purchased the July 1984 bean contracts from Drexler, Burnham and Lambert, Inc. directly. For this Court to now allow the Anderson Brothers to take advantage of the special liquidation provisions would certainly not promote the registration requirements of 7 U.S.C. § 6d.

■ The Court further notes that, even if the commodities liquidation subchapter applied to this situation, the Anderson Brothers' claim fails anyway. The law protects customers of commodity brokers by granting customers priority to "customer property" over all other claims. 11 U.S.C. § 766. "Customer property" is defined as "cash, a security, or other property, or proceeds of such cash, security, or property, received, acquired, or held by or for the account of the debtor, from or for the account of a customer." The Anderson Brothers could not prove that any part of the checking account estate was "customer property." The undisputed testimony was that the funds in the account were from accounts receivable, product purchases, or the liquidation of the Cargill Investors Services account. Bucyrus Grain purchased the Anderson Brothers July bean contracts with Drexel, Burnham and Lambert, Inc., not with Cargill.

Accordingly, this Court finds that the Anderson Brothers' claim must fail.

*C. Multiple Defendants' Claim Under Iola State Bank v. Bolan.*

Don Meinhold, Joseph Zacher, Evelyn Rigney, Dale Nevius, Francis Rickman, Vohs & Moore, and B.W.S. Investments (multiple defendants) claim part of the proceeds based on the authority of *Iola State Bank v. Bolan,* 235 Kan. 175, 679 P.2d 720 (1984). In *Iola State Bank,* farmers received checks for grain sold to a grain elevator. The elevator resold the grain and deposited the funds in its checking account. Sometime later, the farmers presented the checks to the grain elevator's bank for payment. The funds in the checking account were sufficient to cover the checks because of the resale of the grain by the elevator. However, in bad faith, the elevator's bank dishonored the checks, and set off the account against prior loan obligations of the elevator. The farmers sued the bank for conversion.

The Kansas Supreme Court held:

[13] The Bank had actual knowledge of the manner in which Biggs conducted grain purchases and sales. The money in the account was from the sale of grain Biggs had originally purchased from the same farmers and then resold. The Bank had dishonored Biggs' checks drawn on the account for payment to the farmers. The Bank had actual knowledge the funds belonged to a third party. Where a bank actually knows the sums deposited in the account of one of its debtors belong to a third person, it cannot apply such funds against the debtor's obligation to the bank.

The Bank's setoff was improper under K.S.A. 9–1206.

*Iola State Bank,* 679 P.2d at 733, 734.

■ The multiple defendants argue that, as in *Iola State Bank,* State Bank knows the funds in the account belong to a third party (multiple defendants). As such, State Bank cannot in good faith set off the funds against Bucyrus Grain's loan obligation. This Court finds the multiple defendant's arguments unpersuasive. The present case is easily distinguishable from *Iola State Bank.*

The holding in *Iola State Bank* is based entirely on a finding of a lack of good faith on the part of the bank. *Id.* at 731. With the actual knowledge that the debtor was insolvent, the bank set off the funds after the farmers presented the checks for payment. The facts of the present case do not show bad faith by State Bank. In fact, State Bank could not set off the account prior to bankruptcy because of the automatic stay.

In addition, the bank in *Iola State Bank* dishonored the checks in order to keep the funds in the account sufficient to set off.

In the present case, State Bank dishonored the multiple defendant's checks because the debtor filed a petition for bankruptcy. The dishonor by the bank was required by the Bankruptcy Code. The bank did not dishonor the checks in bad faith.

Accordingly, this Court finds that the multiple defendants' claim to the checking account must fail.

This Court further finds that judgment should be for the claimant, State Bank of Spring Hill, for the $46,421.20 being held by it, and against all other parties objecting to its claim.