634 P.2d 398

BLACK, ROBERTSHAW, FREDERICK, COPPLE & WRIGHT, P. C., Development and Construction Services, Inc., Kennedy Machinery Co., Inc., United States of America, ABC Partnership I–V, John Doe and Jane Doe, his wife, XYZ Corporation I–V, Defendants-Appellees,

v.

UNITED STATES of America, Defendant-Appellant.

No. 1 CA–CIV 4596.

Court of Appeals of Arizona, Division 1, Department A.

June 30, 1981.

Rehearing Denied Aug. 12, 1981.

Review Denied Sept. 17, 1981.

William French Smith, Atty. Gen. of the U. S. by M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Karl Schmeidler, James A. Riedy, Attys., Tax Div., Dept. of Justice, Washington, D.C., and Bates Butler, Acting U. S. Atty. by Jose deJesus Rivera, Asst. U. S. Atty., Phoenix, for the U. S.

Black, Robertshaw, Frederick, Copple & Wright, P. C. by Michael W. Wright, Phoenix, for Black, Robertshaw, Frederick, Copple & Wright, P. C.

Taylor & Petica, P. C. by Ray A. Taylor, Scottsdale, for Kealy Const. Co.

## OPINION

EUBANK, Judge.

Kealy Construction Company (Kealy), filed this interpleader action in superior court to determine the priority of competing claims to the interpleaded funds. The United States, appellant, and Black, Robertshaw, Frederick, Copple & Wright, P. C. (Law Firm), appellee, filed cross motions for summary judgment on the issue of their respective priority right to the funds. The trial court granted the Law Firm's motion in a partial summary judgment filed August 1, 1978. The sole issue before us is whether the trial court erred in holding that the Law Firm's claim to the interpleaded funds had priority over the tax lien of the United States.[1]

The facts are not disputed. Kealy and Regal Construction Company (Regal) entered into two construction contracts whereby Regal was to furnish Kealy with construction services and materials in return for $29,124. A dispute arose between Kealy and Regal and the contracts were terminated. Kealy determined it owed Regal only $11,316.50 for the work actually performed and interpled this sum. Regal subsequently went out of business. However, before doing so, Regal assigned the proceeds from the two Kealy contracts to the Law Firm in payment for legal services rendered by the Law Firm to Regal and for future fees. The assignment documents were dated January 6, 1976. The Law Firm filed an Arizona Uniform Commercial Code financing statement covering the assigned accounts receivable with the Arizona Secretary of State on January 16, 1976, at 3:00 p. m. Contemporaneously with the assignments, Regal was having difficulty with the Internal Revenue Service. As a result, Regal was assessed $31,562.61 in taxes, interest, and penalties for unpaid withholding and Federal Insurance Contribution Act

(F.I.C.A.) taxes. A federal tax lien was filed with the Arizona Secretary of State on January 16, 1976 at 1:00 p. m. Thus, the federal tax lien was filed two hours before the Law Firm's financing statement was filed.

Following the filing of the interpleader action and discovery, both parties moved for summary judgment. The United States' motion and memorandum of law claims a priority of lien over the Law Firm based on the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 6321, 6322 (as amended 1966), and 6323(a) and (h) (as amended 1966). In addition, the memorandum argues that A.R.S. § 44–3123 A.5. (U.C.C. § 9–302), as amended, required the Law Firm to file a financing statement since, inferentially, the assignments constituted a significant part of Regal's outstanding accounts. The Law Firm's motion and memoranda did not address the A.R.S. § 44–3123 A.5. (U.C.C. § 9–302) issue, but instead claimed that the "assignment was absolute and divested Regal of any rights whatsoever to the claims against Kealy and passed to [the Law Firm] . . . the sole ownership of those claims." Thus, they argued, since Regal's assignments to the Law Firm were made on January 6, 1976, which was 10 days prior to the effective date of the United States' lien filed on January 16, the Law Firm was entitled to a priority over the United States and summary judgment. In a supplemental memorandum, the Law Firm reiterated the argument that the uncontradicted evidence constituted an "absolute assignment" and argued that because of the "absolute assignment" by Regal to the Law Firm, the Law Firm was not required to file a financing statement with the Secretary of State "since such a filing would only be required if the assignment was for security or collection purposes."[2] No supporting authority was cited for the Law Firm's argument.

---

1. Kealy also appealed from the trial court's denial of its motion for an order discharging it from liability beyond the amount of the interpleaded funds. However, its appeal was dismissed by an order of this Court dated April 17, 1980, "without prejudice to the appeal of the United States of America."

2. Assignment for collection is expressly excluded from Article 9 coverage by A.R.S. § 44–3104.6. (U.C.C. § 9–104).

In the United States' response, it again raised the A.R.S. § 44–3123 A.5. (U.C.C. § 9–302) issue. The Law Firm, the first time in its reply, directly addressed the issue, stating that "the filing of a financing statement was not required because the assignments were absolute in nature and were not for the purpose of perfecting a security interest in and to the receivables." Again no authority supporting the Law Firm's contention was cited.

On the basis of these pleadings and following argument, the trial court granted the Law Firm partial summary judgment "as a matter of law" and included Rule 54(b), Rules of Civil Procedure, 16 A.R.S., language making the judgment immediately appealable. Thus the United States has appealed from the partial summary judgment in favor of the Law Firm contending that the trial court erred as a matter of law. We agree.

Our analysis begins with the question of whether the Law Firm was ever obligated to file a financing statement with the Secretary of State because of Regal's assignment of accounts to it. Prior to Arizona's adoption of the Uniform Commercial Code in 1967, notice of any sale or assignment of an account was required to be filed in order for the assignee to obtain a priority over present and future creditors. A.R.S. § 44–801 et seq. (repealed, 1967). Thus prior to January 1, 1968, the effective date of the Arizona U.C.C., the Law Firm would have been required to file a notice of assignment with the Secretary of State in order to perfect its interest in the account and to obtain a priority over the United States tax lien.

■ With our adoption of the Uniform Commercial Code in 1968, the assignment of accounts statutes were repealed. Such assignments, with certain exceptions, are now covered by Article 9 of the Code, A.R.S. § 44–3101 et seq. Turning to the Code, "security interest", is defined, in part, as including "any interest of a buyer of accounts . . . which is subject to Article 9." (A.R.S. § 44–2208 (37) [U.C.C. § 1–201]). In Article 9, an "account" is defined as "any right to payment for . . . services rendered which is not evidenced by an instrument[3] or chattel paper[4] whether or not it has been earned by performance." A.R.S. § 44–3106 [U.C.C. § 9–106], as amended. A.R.S. § 44–3102 A.2. [U.C.C. § 9–102(1)(b)] states that Article 9 applies "to any sale of accounts or chattel paper." The only exceptions are detailed in A.R.S. § 44–3104.6. [U.C.C. § 9–104], none of which are claimed to be applicable here. Finally, A.R.S. § 44–3123 A.5. [U.C.C. § 9–302(1)(e)] requires the filing of a financing statement "to perfect all security interests except . . . (5). An assignment of accounts which does not alone or in conjunction with other assignments to the same assignee transfer *a significant part* of the outstanding accounts of the assignor." (Emphasis added). Thus, the legislative intent is clear and we conclude that the Law Firm was required to file a financial statement to perfect its security interest in Regal's assigned accounts unless the assignment did not constitute a "significant part of the outstanding accounts" of Regal.

The complete answer, however, lies in determining whether "a significant part" of Regal's accounts was assigned and which party bears the burden of proving significance or insignificance. The courts have recognized three tests in determining the *significant* account question. They are, (1) a percentage of accounts test, (2) a "casual

---

**3.** Definition A.R.S. § 44–3105 A.11:

"Instrument" means a negotiable instrument (defined in § 44–2504), or a security (defined in § 44–3002), or any other writing which evidences a right to the payment of money and is not itself a security agreement or lease and is of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment.

**4.** Definition A.R.S. § 44–3105 A.3:

"Chattel paper" means a writing or writings which evidence both a monetary obligation and a security interest in or a lease of specific goods. When a transaction is evidenced both by such a security agreement or a lease and by an instrument or a series of instruments, the group of writings taken together constitutes chattel paper.

and isolated transaction" test, and (3) a combination of both (1) and (2). Representative cases of the test are analyzed and collected in Annot., 85 A.L.R.3d 1050, *When is Filing of Financial Statement Necessary to Perfect an Assignment of Accounts Under U.C.C. § 9–302(1)(e)*. White & Summers, *Uniform Commercial Code*, § 23–8 (1972) discusses the tests and comes down on the side of certainty, the percentage test, saying:

> Returning to the question—what assignments are not of a "significant part" of the outstanding accounts of the assignor, and therefore automatically perfected—one finds two somewhat inconsistent tests for determining whether a given set of accounts is a "significant part". The position of Professor Kripke and Mr. Felsenfeld [65] seems to be that the relative "casualness" of the sale is the overriding consideration. They state ". . . the Code is intended to govern practical commercial transactions." [66] One infers from that statement that they might permit a nonprofessional assignee to take a comparatively larger share of an assignor's account without requiring him to file under 9–302(1)(e) than they would if the assignee were a bank or another financial institution. This proposition finds support in the Comments to 9–302 which identify "casual or isolated" assignments as those entitled to the benefit of Section 9–302(1)(e). A second approach is to disregard the professional status of the assignee and to ask only what percentage of the total accounts of the assignor were assigned and whether those accounts as percentage of the whole constitute a "significant" part. Although he does not say so in so many words, Referee Nims in *In re Boughner* [67] appears to reject the Kripke and Felsenfeld analysis and there finds that the transfer by an insurance agent of all of his insurance commissions to a third party, not in the business of lending, was the assignment of a significant part and was therefore not automatically perfected under 9–302(1)(e). Neither the *Boughner* case nor any other gives a clear picture about what percent-

age would be regarded as "significant" if that were the test. One district court case in Arkansas has found that 16% of the outstanding accounts was not a significant part. [68] The most articulate judicial statement of the Kripke-Felsenfeld proposition is found in *Abramson v. Printer's Bindery, Inc.* [69] Chief Justice Kickson, writing for the Texas Court, finds that:

> The transfer of the accounts in this case may be characterized as casual or isolated. Certainly there is no evidence that Bindery 'regularly takes assignments of any debtor's account,' to quote the language used in the commentary. The purchase by Bindery in this instance was done at the behest of the auditor, Bumpass. He persuaded Wertz, Bindery's President, to have Bindery purchase the accounts, (1) as a safe investment and (2) to enable a good customer of long standing to meet pressing short term debts. It is undisputed, as we shall point out later in this opinion, that so far as Graphic and its creditors are concerned Bindery paid a fair, adequate consideration for the accounts. [70]

This seems to us an appropriate place to exercise our bias in favor of certainty. If the courts define "significant" in terms of a percentage of the total accounts of the assignor, we can hope for the cases to produce a comparatively certain and reliable rule on which creditors and debtors can rely. If, on the other hand, we leave it to the courts to determine which sales are casual and isolated and which are not, we suspect that the process could go on for the rest of this century and part of the next without ever producing a rule on which a lawyer could rely. Since we see no powerful policy at work other than the desire to have the law certain, we hope the courts will follow the lead of Referee Nims and of Judge, Harris and define "significant" in terms of a percentage of the assignor's accounts or contract rights. [71] (Footnotes omitted).

*See also*, Annot., 30 A.L.R.3d 9, § 18[d]; 3 Uniform Laws Annot. § 9–320; Case Note, *Assignment of Accounts . . . the 9–302(1)(a) Filing Exemption*, 1977 Utah Law Rev. 331.

Although we find White & Summer's discussion above persuasive, it is not necessary for us to select a specific test for Arizona because such evidence was not presented in support of the motion for summary judgment by the Law Firm. As we pointed out in some detail earlier in this opinion, the Law Firm took the position that Article 9 did not apply to its transaction with Regal. Thus, no effort was made to present evidence regarding the "significant part" of the assignment of Regal's outstanding accounts of the assignor Regal even though the United States specifically raised the issue. In U.C.C. § 9–302(1)(e) determinations, the courts have viewed "significant part" evidence as defense matter and have placed the burden of proving "insignificance" on the assignee, in this case, the Law Firm. *See* cases collected and discussed in *Consolidated Film Industries v. U.S.*, 547 F.2d 533 (10th Cir. 1977). In Professor Grant Gilmore's book, *Security Interests in Personal Property*, § 19.6 (1965), he tends to agree, stating:

> Section 9–302(1)(e) exempts from filing "an assignment of accounts or contract rights which does not alone or in conjunction with other assignments to the same assignee transfer a significant part of the outstanding accounts or contract rights of the assignor."

The paragraph (e) filing exemption is to be contrasted with § 9–104(f), which makes "the Article" inapplicable to certain transfers of accounts, contract rights and chattel paper which are not made in anything that could reasonably be described as a financing transaction—for example, transfers for collection only.[1] The transactions described in § 9–302(1)(e) remain subject to the provisions of the Article and are exempted only from the filing requirement—which means that a security interest arising from such a transaction is automatically perfected when it attaches.

> *Paragraph (e) seems to provide more a line of defense in litigation or bankruptcy proceedings than a guide for prospective action.* At the time of taking an assignment no assignee can know that this assignment, together with others which may be made to him in the future, will not result in the "transfer [of] a significant part" of the assignor's receivables; certainly no sane assignee will take the risk that he could convince a judge, jury or referee of his own insignificance. All right-minded assignees will, therefore, file. The reason for the paragraph (e) exemption lies in the fact that Article 9, like the pre-Code accounts receivable statutes, covers sales as well as security transfers of receivables. As a general rule there are sound reasons for what seems to be, at first blush, an unnecessarily broad coverage.[2] However, when the net is spread so wide, some strange fish may be caught. (Emphasis added). (Footnotes omitted).

*Id.* at pp. 537–38.

The general rule governing the burden of proof in Arizona is that a party who asserts the affirmative of an issue has the burden of proving it. *Harvey v. Aubrey*, 53 Ariz. 210, 213, 87 P.2d 482, 483 (1939). The same rule is applicable to a defense where confession and avoidance, an affirmative defense or a counterclaim is pled by the defendant. *Id.*; Udall, *Arizona Law of Evidence*, § 5 (1960). As indicated above, regardless of which test for "significant part" is used, the burden of establishing "insignificance" is on the assignee Law Firm. *Consolidated Film Industries v. U.S.*, *supra*; *Architectural Woods, Inc. v. State*, 88 Wash.2d 406, 562 P.2d 248 (1977). As already discussed, because of the legal theory that the Law Firm relied on, the firm presented no evidence of "insignificance". Thus, the Law Firm did not carry its burden of proving the A.R.S. § 44–3123 A.5. [U.C.C. § 9–302(1)(e)] exception and was not, therefore, entitled to partial summary judgment as a matter of law.

The same cannot be said for the United States. Its motion for summary

judgment demonstrated that its tax lien had been perfected, pursuant to Internal Revenue Code of 1954, § 6323(a) and (h), and was prior in time to the financial statement filed by the Law Firm. Therefore, the United States was entitled to partial summary judgment on its motion, pursuant to our priority statute, A.R.S. § 44–3122 [U.C.C. § 9–301], as a matter of law. *United States v. Globe Corp.*, 113 Ariz. 44, 546 P.2d 11 (1976).

The partial summary judgment filed on August 31, 1978 is reversed. Since there is no factual issue and since the United States is entitled to judgment as a matter of law, on remand the trial court is directed to enter summary judgment on the issue of priority in favor of the United States.

FROEB and DONOFRIO, JJ., concur.